HALL, Judge.
This is a suit by a plaintiff contractor against a defendant home owner to recover the sum of $855.95 balance due on a written contract to furnish and install a central air conditioning and heating system in the second floor of defendant’s home. Defendant answered and filed a re-conventional demand for $1,500.00 alleging failure of plaintiff, in several respects, to complete the contract in a good workmanlike manner and according to its terms and conditions.
There was judgment in favor of plaintiff as prayed for and further judgment dismissing defendant’s reconventional demand. Defendant appealed.
The contract was entered into on August 25, 1966 and the installation was completed and tested by plaintiff as to air conditioning on September 13, 1966. Plaintiff lighted the pilot of the heating unit and tested it on October 20, 1966. Defendant made two partial payments of $1,000.00 each on account of the contract price leaving a balance due amounting to $855.95 which became due in November 1966 and has never been paid.
We find, contrary to defendant’s contention, that the contract was substantially performed by plaintiff and that he is entitled to the balance due on the contract price subject to a reduction for any work proved by defendant to be unfinished or defective. Aireo Refrigeration Service, Inc. v. Fink, La.App., 127 So.2d 290, affirmed 242 La. 73, 134 So.2d 880; A. A. Home Improvement Company, Inc. v. Irwin, La.App., 203 So.2d 888.
Defendant’s principal complaints with reference to the work are that the air conditioning is excessively noisy and fails to cool the entire second floor adequately and that the electronic air cleaner has never worked since installation.
Approximately three weeks after the air conditioning unit was placed in operation defendant telephoned plaintiff complaining of the noise the unit was making and that it was not adequately cooling the rooms. Plaintiff made several visits to defendant’s home with respect to these complaints but in his opinion the noise complained of was nothing more than the usual noise experienced by others with similar units. Plaintiff satisfactorily corrected' several other items complained of by defendant.
On March 1, 1967 defendant wrote plaintiff complaining again about the noise “which comes from the return air intake.”
In response to this letter plaintiff together with an engineer employed by the Trane Company (The air conditioning and heating unit was manufactured by the Trane Company) made an inspection of the installation on June 24, 1967. The engineer did not find any unusual noise but found that the air flow was only 1150 cubic feet per minute when it should have been 1480 cubic feet per minute. To correct this the Trane engineer changed a pulley in the unit and stepped up the fan revolutions. However not having a tachometer he did not check the RPM of the fan.
During their inspection plaintiff and the Trane engineer found that the air filter was clogged up. They cleaned it and warned defendant that the filters would have to be cleaned regularly and that the weeds around the compressor outdoors would have to be kept cut for maximum air conditioning. Both plaintiff and the Trane engineer testified that the unit was *808 in good functioning condition when they left the house.
On August 8, 1967 defendant wrote plaintiff stating that “at least we now know that the Trane machine itself is as quiet as possible, but the installation still emanates an inordinate amount of noise from the return air duct.” Plaintiff filed suit on August 31, 1967.
Defendant adduced the testimony of Mr. Leonidas L. Denson, a consulting engineer, a member of the American Society of Mechanical Engineers and of the American Society of Heating, Refrigeration and Air Conditioning Engineers, most of his experience for the past thirteen years having been in the field of air conditioning and heating. Mr. Denson testified that he inspected plaintiff’s installation on December 2, 1967. JBy using a tachometer he found that the fan was operating at 825 to 850 RPM’s when the Trane specifications call for a maximum of 780. He testified that the excess fan speed would tend to increase the noise factor.
Mr. Denson also testified that he removed the return air grill situated in the second floor hallway and with a light looked up into the return air passage leading to the ceiling. He found that the air passage was enclosed with sheet rock and 2" x 4" lumber. There was no sheet metal in the air passage and it was not lined with insulating material.
Defendant contends that the entire return air passage should have contained a metal duct lined with insulating material in accordance with the following contract provision:
i£ * * * The return air connection and the transition between the heater and the cooling coil to be rectangular duct work, and to be lined internally with y-j" thick vapor barrier type insulation si; * * >»
The crux of the matter is the meaning of the term “return air connection” as used in the contract. Plaintiff contends that the return air passage from the grill to the ceiling is not a “return air connection” but a “return air chase” which is simply boxed in and requires no duct work. He testified: “ * * * The ‘return air connection’ is a piece of duct from a hole that is made by the return air chase in the ceiling to the inlet of the heater * * * ” The Trane engineer testified to the same effect.
Defendant’s expert, Mr. Denson, testified as follows:
“Q. Would you tell us what is meant by the term in the industry, as you un-stand it in the industry, the term air connection? What does this refer to, sir ?
“A. Uniformly throughout the industry, and I don’t recall any exceptions, this would mean to me the entire air passage from the return air grill into the fan inlet.”
Mr. Denson admitted that the return air passage boxed in with sheet rock and 2 x 4’s is called a “chase” but insists that the contract calls for lined metal duct work to be placed inside this chase from grill to ceiling. He stated that if this were done it would further tend to reduce the noise level, but no where in his testimony does he state that the air conditioning was making an unusual amount of noise.
While Mr. Denson is admittedly an expert in the field of air conditioning, it is also true that both plaintiff and the Trane engineer have had years of experience in this field and we cannot say that the Trial Judge committed manifest error in giving more weight to their testimony.
However we find that the speed of the fan was too high and Mr. Denson testified that the speed should be reduced to the Trane specifications and that the air flow should then be rebalanced throughout. He estimated the cost of doing this would amount to between $40.00 and $50.00.
The record contains a great deal of conflicting testimony regarding the electronic *809 air cleaner. Defendant contends that it never did function, that the needle indicator always stood on “low”. However when plaintiff and the Trane engineer inspected the work on June 24, 1967 they found the needle to be at “normal”. They did not inspect the electronic plates.
In his letter of August 8, 1967, just before suit was filed, defendant again complained of the needle remaining constantly at “low”.
Mr. Denson testified that when he examined plaintiff’s work on December 2, 1967 he inspected the filter unit of the air cleaner and found the filters spotlessly clean as if the unit had never worked. Mr. A1 Martinez, a service mechanic for General Heating and Air Conditioning, trained in the service and repair of Honeywell electronic air cleaners such as the one furnished by plaintiff, testified on behalf of defendant. He testified that he inspected the unit in question in the latter part of last year (1967) and found that a wire on one of the cells was broken causing a short circuit and that the unit was dead. He also found a small screw inside the cell which he could not account for and which might also have been the cause of the cell shorting. He found the electronic plates to be absolutely clean indicating that the air cleaner had been inoperative for some time although he could not tell how long it had functioned if it ever had. He estimated that it would cost $43.50 to replace the shorted wire.
The record reveals that there is about a ten foot split in the insulation around the copper tubing running down the outside of the house to the compressor and that the cost of repairing it would be approximately $10.00.
We do not find that defendant has borne the burden of proving the air conditioning was excessively noisy or that it would not cool the rooms sufficiently if the filters were kept clean and the compressor was kept clear of grass and weeds.
Defendant testified that despite numerous demands plaintiff has failed to furnish him with the set of instructions called for by the following provision of the contract:
“After installation, our qualified representative will start, test and provide detailed written instructions on the use and maintenance of the equipment.”
Defendant contends that due to plaintiff’s failure to comply with this contract provision he is entitled to the cost (estimated to be $500.00) of having an engineer prepare for him a complete wiring diagram of the entire air conditioning and heating system installed by plaintiff including a wiring diagram of the electronic air cleaner. It is interesting to note that the preparation of a wiring diagram for the air cleaner alone is estimated to cost $400.00 which exceeds the price of the cleaner.
While we find that plaintiff failed to furnish the written instructions as required by the contract the record contains no proof that the “detailed written instructions” due thereunder either customarily do, or necessarily should, include a complete wiring diagram. Except for his contention with reference to the wiring diagram defendant has offered no proof of monetary damage from plaintiff’s failure to furnish the written instructions.
For the foregoing reasons we are of the opinion that the balance due plaintiff on the contract price should be reduced by a total of $98.50 made up of the following amounts:
$45.00 representing the cost of reducing the fan speed and rebalancing the air flow;
$43.50 representing the cost of replacing the shorted wire in the air cleaner; and by
$10.00 being the cost of repairing the insulation on the copper tubing running to the compressor.
*810 The judgment appealed from is amend-er by reducing the amount of the judgment in plaintiff’s favor from the sum of $855.-95 to the sum of $757.45 and as so- amended and in all other respects the judgment is affirmed; costs of this appeal to be borne in equal proportions by appellant and appellee.
Amended and affirmed.